UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CITY OF WARREN POLICE AND FIRE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>ZEBRA TECHNOLOGIES CORPORATION, ANDERS GUSTAFSSON and MICHAEL C. SMILEY,<br><br>Defendants. | Civil Action No. 2:17-cv-04412-SJF-AKT<br>**(Consolidated)**<br><br><u>CLASS ACTION</u><br><br>CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

Lead Plaintiff City of Taylor Police and Fire Retirement System ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Zebra Technologies Corporation ("Zebra" or the "Company") press releases, Securities and Exchange Commission ("SEC") filings, analyst reports, media reports, other publicly disclosed reports and information about the defendants, and interviews with former employees of the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1. This is a federal securities class action on behalf of all persons who purchased Zebra common stock between November 4, 2014 and November 9, 2015, inclusive (the "Class Period") seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5]. Plaintiff alleges claims against defendant Zebra and two individuals who were senior executives of Zebra during the Class Period.

2. Defendant Zebra manufactures and distributes thermal barcode label, card, and receipt printers. The Company also manufactures passive radio frequency identification device "RFID" printers and encoders and active RFID asset tracking products for identifying, tracking and managing assets, people and transactions. This case focuses on Zebra's October 2014 acquisition of Motorola Inc.'s Enterprise division ("Motorola Enterprise"), and in particular, Defendants' failure to

disclose problems the Company was experiencing in connection with the acquisition and the significant costs it would take to remedy them.

3. Prior to the acquisition, Motorola Enterprise was substantially larger than Zebra, with net sales of nearly two and one-half times as great as Zebra's. Accordingly, once the deal closed, in October of 2014, Zebra was tasked with, *inter alia*, migrating an enormous amount of data from Motorola Enterprise onto its own systems, combining the sales forces and compensation structures of the two companies, aligning the companies so it could properly prepare the taxes of the now much larger Zebra, and rebranding the Motorola Enterprise business as part of Zebra.

4. As detailed herein, during the Class Period, Defendants repeatedly claimed that the Motorola Enterprise acquisition would yield substantial "cost synergies" and "cost savings" for the combined companies. For example, on March 17, 2015, Defendant Anders Gustafsson ("Gustafsson"), Zebra's Chief Executive Officer ("CEO"), told the market that the Company was "on target to achieve the $150 million in synergies by the end of 2016, with $50 million to $75 million in savings this year." Defendants, however, failed to disclose that any "cost synergies" or "cost savings," realized from the acquisition in the short run would largely be offset by hundreds of millions of dollars in incremental spending necessary to complete the acquisition and to remedy severe and undisclosed problems encountered during the migration from Motorola-supported IT systems to those of Zebra's.

5. First, Defendants steadfastly denied the existence of problems relating to the integration of Motorola Enterprise, and falsely and misleadingly claimed, *inter alia*, that the integration was "progressing as planned" and that Defendants were "very pleased with the progress of our integration efforts." In truth, however, Defendants knew, or recklessly disregarded, that the

integration of the IT system of Motorola Enterprise with that of Zebra's had become exceedingly onerous, requiring the Company to spend up to $200 million dollars.

6. In addition, at or shortly after the time of the acquisition, Defendants had determined to rebrand the operations of Motorola Enterprise, at a significant cost.

7. Defendants' representations associated with the cost synergies expected to be realized by the acquisition of Motorola Enterprise were materially false and misleading when made because, as Defendants knew, such representations failed to disclose material facts associated with the then on-going costs to integrate and rebrand the operations of Motorola Enterprise.

8. Once Defendants chose to speak about the integration of Motorola Enterprise, they had a duty to speak completely and truthfully, including speaking about the costs, and not just the savings, associated therewith.

9. Following the acquisition, Defendants identified the existence of deficiencies in Zebra's internal controls over financial reporting and disclosure controls and procedures. Despite the recognition of material weaknesses identified in its internal controls and procedures over financial reporting and disclosure, Zebra nevertheless continued to provide financial guidance throughout the entirety of the Class Period. This included, *inter alia*, the Company's gross margin outlook.

10. As a result of Defendants' fraudulent scheme, the price of Zebra's stock was artificially inflated throughout the Class Period.

11. On August 11, 2015, Zebra announced its financial results for the second quarter of 2015 and revealed a miss of its previously issued gross margin guidance. Defendants disclosed that the miss was a result of the "impact of purchase accounting and one-time accounting adjustments related to [Motorola] Enterprise that adversely affected results" and "expenses associated with the rebranding of products containing the Motorola marks."

12. In response to these disappointing results, the price of Zebra common stock declined from $110.04 per share on August 10, 2015 to close at $83.80 per share on August 11, 2015 – a decline of approximately $26.24 per share, or approximately 24%.

13. Nevertheless, Defendants continued to mislead the market about the true costs associated with the acquisition of Motorola Enterprise by deceptively announcing, the same day, that they "remain on track to achieve our target of $150 million of run rate savings by the end of 2016." In actuality, Zebra needed to spend a large percentage of its relatively small cash balance to remedy the systemic problems with the IT systems migration and rebrand the operations of Motorola Enterprise, which Defendants knew, or recklessly ignored, would largely offset the cost synergies and savings which Defendants had boasted about.

14. On November 10, 2015, Zebra disclosed that ***$180 to $200 million*** in incremental spending was necessary to integrate the IT systems of Motorola Enterprise. Defendant Gustafsson revealed to the market that "the complexity of the IT systems has been greater than we had expected. Motorola had a bit of a patchwork of systems, a lot of customization. They didn't necessarily all talk to each other. . . ."

15. In response to this disappointing news, the price of Zebra common stock declined from $82.99 per share on November 9, 2015 to close at $75.78 per share on November 10, 2015 – a decline of approximately $7.21 per share, or approximately 8.7%.

16. As these revelations entered into the market, the price of Zebra common stock declined substantially, ultimately sending Zebra's stock price down ***36%*** at the end of the Class Period from its Class Period high.

17. As a result of Defendants' wrongful acts and omissions, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

18. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and SEC Rule 10b-5 [17 C.F.R. §240.10b-5]. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

19. Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because many of the acts and conduct complained of herein occurred in substantial part in this District.

20. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the NASDAQ Global Select Market ("NASDAQ"), a national securities exchange.

## PARTIES

21. Lead Plaintiff City of Taylor Police and Fire Retirement System, as set forth in its certification previously filed with the Court and incorporated herein by reference, purchased Zebra common stock during the Class Period at artificially inflated prices and was damaged thereby.

22. Defendant Zebra is a publicly traded company based in Lincolnshire, Illinois that designs, manufactures, and sells a wide range of products that capture and move data, including, *inter alia*, mobile computers, barcode scanners and imagers, RFID readers, and specialty printers for barcode labeling and personal identification. Zebra maintains a large lab and warehouse facility located at 1 Zebra Plaza in Holtsville, New York. Zebra's Enterprise unit, which is central to the claims in this action, had been headquartered in Holtsville, New York prior to its acquisition by Zebra from Motorola in 2014. Zebra common stock is listed and trades on the NASDAQ under the ticker symbol "ZBRA." As of May 8, 2018, Zebra had more than 53 million shares of common stock issued and outstanding.

23. Defendant Gustafsson has served as the CEO of Zebra and a member of its Board of Directors since September 4, 2007.

24. Defendant Michael C. Smiley ("Smiley") served as the Company's Chief Financial Officer ("CFO") from May 1, 2008 through November 15, 2016, when, according to the Company, he resigned.

25. Defendants Gustafsson and Smiley are sometimes referred to collectively herein as the "Individual Defendants." Unless otherwise noted, Defendant Zebra and the Individual Defendants are collectively referred to as "Defendants."

26. Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets, and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.

27. It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the Individual Defendants, by virtue of their high-level positions with the Company and/or control of the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as

alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

28. As officers and controlling persons of a publicly held company whose shares were registered with the SEC pursuant to the Exchange Act, and were traded over the NASDAQ, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded shares would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

29. The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their membership on the Company's Board of Directors and/or executive and managerial positions with the Company, each of the Individual Defendants had access to the adverse undisclosed information about Zebra's business and financial condition and performance as particularized herein and knew, or recklessly disregarded, that these adverse facts rendered the positive representations

made by or about the Company and its business issued or adopted by the Company materially false and misleading.

30. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

## CLASS ACTION ALLEGATIONS

31. Plaintiff brings this action as a class action on behalf of all purchasers of Zebra common stock during the Class Period (the "Class").

32. Excluded from the Class are Defendants and their families, the officers and directors and affiliates of the Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

33. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands, of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Zebra or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

34. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

35. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

36. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants violated the Exchange Act;

(b) whether statements made by Defendants to the investing public omitted and/or misrepresented material facts about the business and operations of Zebra;

(c) whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(d) whether the price of Zebra common stock was artificially inflated; and

(e) to what extent the members of the Class have sustained damages and the proper measure of damages.

37. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### The Company and Its Business

38. Defendant Zebra was founded in 1969 as "Data Specialties Incorporated," a manufacturer of high-speed electromechanical products. The Company changed its focus to specialty on-demand labeling and ticketing systems in 1982, and changed its name to "Zebra Technologies Corporation" in 1986. In 1991, Zebra completed its initial public stock offering on the NASDAQ.

39. Currently, Zebra designs, manufactures, and distributes thermal barcode label, card, and receipt printers. The Company also manufactures passive RFID printers and encoders and active RFID asset tracking products for identifying, tracking and managing assets, people and transactions.

40. The Company's operations consist of two segments: (1) Asset Intelligence & Tracking ("AIT"), formerly the legacy Zebra business consisting of barcode and card printing, location solutions, supplies, and services operations; and (2) Enterprise Visibility & Mobility ("EVM"), formerly Motorola Enterprise, comprised of mobile computing, data capture, RFID, and services operations. According to the Company's website, Zebra currently has approximately 7,000 employees in 115 offices across 50 countries.

41. Zebra's EVM, formerly Motorola Enterprise, segment has its roots in Symbol Technologies, Inc. ("Symbol"). By way of background, in 2006, Motorola Inc. ("Motorola") acquired all outstanding shares of Symbol, a manufacturer and worldwide supplier of mobile data capture and delivery equipment. Symbol had been plagued by a severe and wide-ranging accounting fraud that artificially inflated its revenue and earnings. Symbol was forced to restate nearly four years of earnings, from 1998 to 2001, and pay $37 million to settle charges brought by the SEC. Four former Symbol executives pleaded guilty to a variety of charges relating to the accounting fraud.

42. In addition, Symbol's former CEO, Tomo Razmilovic, the suspected mastermind of the accounting fraud accused of 13 counts of securities fraud, remains a fugitive of the U.S. government. In announcing the Symbol acquisition in 2006, Motorola stated that Symbol would "become a wholly owned subsidiary of Motorola and will be the cornerstone of Motorola's Networks and Enterprise business."

43. After Motorola's acquisition of Symbol, Symbol essentially took over Motorola's Enterprise division, as it was far larger than the pre-merger division. Symbol remained part of Motorola Solutions, Inc. ("Motorola Solutions"), the legal successor to Motorola, after Motorola spun off its mobile phone division as Motorola Mobility in 2011.

**(a) Zebra Acquired Motorola Enterprise Emphasizing the Integration and the Synergies to Be Obtained**

44. On April 15, 2014, Zebra issued a press release, which it filed with the SEC on Form 8-K, announcing that it had reached a definitive agreement to acquire Motorola Enterprise – formerly Symbol – for $3.45 billion in cash. Later that same day, on a conference call with analysts to discuss the announcement, Defendant Smiley stated that the transaction would be funded "through a combination of $3.25 billion of new capital raised with debt and $200 million of cash on hand."

45. Defendant Smiley also announced during the conference call that Zebra expected to have a significant leverage ratio "of around five times debt-to-adjusted EBITDA at closing." A report issued the same day by analysts at Wells Fargo Securities expressed concern about the substantial debt the Company would be taking on in connection with its acquisition of Motorola Enterprise, stating that "***the leverage ratio of 5.0x at the close of the deal increases the company's risk profile*** given the cyclicality of the business."[1]

[1] All emphasis is added unless otherwise noted.

46. By acquiring Motorola Enterprise, Zebra took on a company significantly larger than itself. At the time the acquisition was announced on April 15, 2014, Zebra had approximately 2,600 employees and $1 billion in revenues; Motorola Enterprise had approximately 4,500 employees and $2.5 billion in revenues.

47. As stated in a report issued by Northcoast Research on April 16, 2014, just after the acquisition was announced, "Zebra ***more than triple[d] its size*** with market leading products in three large product categories: mobile computing, data capture (scanners) and barcode printers." In addition, as later noted in a May 28, 2015 research report issued by Oppenheimer, the acquisition of Motorola Enterprise "was a big undertaking, as its pro-forma sales of ~$2.4B were ***~2x bigger than stand-alone Zebra***."

48. Despite this massive undertaking, from the beginning, Defendants pitched the significant synergies to be realized in connection with the acquisition to investors. For example, on the April 15, 2014 conference call during which Zebra announced the acquisition, Defendant Smiley stated that "[w]e expect the transaction to be materially accretive in the first full year on a cash EPS basis. As synergies are realized, we expect the acquisition ROIC to exceed our cost of capital within three years."

49. On October 30, 2014, Zebra filed a Form 8-K with the SEC announcing that it had completed its previously announced acquisition of Motorola Enterprise. The Master Acquisition Agreement between Zebra and Motorola Solutions expressly stated that the assets being acquired included all "Trade Receivables," *i.e.*, "[a]ll of the accounts and notes receivable and unbilled revenues to the extent relating to or arising from the sale of goods or materials and the rendering of services in connection with the operation of the Business (the 'Accounts Receivable'), together with all unpaid interest accrued thereon, if any."

50. During the Class Period, Defendants repeatedly boasted about the significant "savings" and "synergies" that would be realized following the Company's acquisition of the much larger Motorola Enterprise business.

51. For example, on Zebra's November 4, 2014 earnings call, Defendant Gustafsson lauded the significant savings to be achieved as a result of the acquisition, stating:

> ***[W]e are committed to creating shareholder value through achieving $150 million in cost synergies. We expect $100 million of these savings to be realized in operating expenses and $50 million in cost of goods, as we streamline the purchasing of common components and rationalized vendors. Our current plan calls for exiting 2015 with [$50] million to $75 million in captured synergies on a run-rate basis, with the remainder achieved the following year***.

52. Throughout the Class Period, Defendants continued to make positive statements about both the integration and the savings that the Company would realize in connection with the acquisition of Motorola Enterprise. Indeed, on Zebra's March 17, 2015 earnings call, Defendant Gustafsson told the market that the Company was "***on target to achieve the $150 million in synergies by the end of 2016, with $50 million to $75 million in savings this year***."

53. Defendants knew, however, but failed to disclose, that the integration of Motorola Enterprise was hampered by severe problems, in particular with the migration of relevant data from Motorola Enterprise's IT systems onto Zebra's systems. These issues necessitated significant expenditure by the Company to fix and would largely offset any purported savings to be realized in the short term from the acquisition.

**(b) Despite Experiencing Substantial Problems with the Integration During the Class Period, Defendants Continued to Assure the Market Things Were "Progressing as Planned"**

54. The root cause of many of Zebra's problems with the integration related to the migration of data between the Enterprise Resource Planning ("ERP") systems of Motorola and

Zebra. ERP systems incorporate a company's crucial business functions including sales and distribution, production planning, logistics execution, and supply chain management.

55. Because Zebra acquired the Motorola Enterprise division, and not all of Motorola Solutions, Zebra only needed the data related to Motorola Enterprise, which was stored on Motorola Solutions' systems. Former Employee 1 ("FE1") was a Director of Sales Operations during the Class Period. According to FE1, Zebra entered into a contract with Motorola Solutions which allowed Zebra to access Motorola Solutions' systems to extract the relevant data. Workers were then tasked with figuring out how to merge these two pieces together and integrate them into Zebra's systems.

56. FE1 stated that there were many challenges associated with completing this complicated task and noted that the "data piece was brutal."

57. Former Employee 2 ("FE2") was a Senior Tax Analyst at Zebra from before the start of the Class Period until December 2014. FE2 stated that pulling out the data attached to the portion of Motorola's business that Zebra acquired was an issue. FE2 described that there was a "scramble" of trying to get Motorola's sales data and accounting information because "they didn't have enough time to bring over their sales data and their accounting information into the existing ERP at Zebra…the existing computer systems, their accounting system…They were still doing billing and all that at Motorola."

58. Problems associated with assembling data from Motorola Enterprise severely impacted Zebra's ability to, *inter alia*, develop and execute its sales compensation plan and prepare its tax returns. According to FE1, almost immediately after the Motorola Enterprise acquisition was announced in April of 2014, the decision was made by Joachim "Joe" Heel, SVP of Global Sales, to combine the sales organizations and compensation plans of both Motorola Enterprise and Zebra as

quickly as possible. FE1 stated that a combined sales organization and compensation plan was expected to be rolled out by January of 2015. FE1 referred to this schedule as "very aggressive." According to FE1, the sales organizations of the two companies were very different in terms of their systems and compensation structures.

59. FE1 noted that trying to integrate sales commission structures without the necessary data became "very complicated." In addition, FE1 stated that the data issues related to the integration of the sales compensation structures and Zebra being understaffed to properly deal with them were "well known" within the Company.

60. FE1 also reported that there was "constant conversation" that management did not want to increase the size of the staff to deal with integration issues because it was already under pressure from the massive debt that Zebra took on in its acquisition of Motorola Enterprise.

61. FE1 recalled being on a telephone call in 2015 with Defendant Gustafsson and Mike Terzich, Zebra's Chief Administrative Officer, to discuss bringing on additional personnel to help resolve some of the data issues.

62. Despite all of these issues, during the Class Period, Defendants led the market to believe that the integration was going smoothly. For example, on Zebra's March 17, 2015 earnings call with investors, Defendant Gustafsson stated that "***[s]ince the enterprise acquisition closed on October 27, we have been very pleased with the progress of our integration efforts, and the resulting success***" and declared "***[t]he integration is progressing as planned***." Defendants continued to provide updates on the status of the integration, but failed to disclose the extent of the problems they faced in connection with the integration and that hundreds of millions of dollars in incremental spending was required to fix them.

**(c) Defendants Disclosed Internal Control Deficiencies but Continued to Provide Financial Guidance for Numerous Financial Metrics, Including for Gross Margins**

63. On March 17, 2015, Zebra filed its annual financial report on Form 10-K with the SEC for the fiscal year 2014 (the "2014 Form 10-K"), which was signed by Defendants Gustafsson and Smiley. In the 2014 Form 10-K, Zebra stated, *inter alia*, that it had identified deficiencies in its internal controls over financial reporting. Specifically, the 2014 Form 10-K stated, in pertinent part, as follows:

> **Changes in Internal Control over Financial Reporting**
>
> ***In connection with our initial reviews of internal controls for Enterprise, we have identified certain internal control deficiencies related to Enterprise***. We continue to identify and review the internal controls of the Enterprise business and are establishing a plan of remediation that is consistent with our obligation to assess the effectiveness of Enterprise's internal controls over financial reporting as of December 31, 2015.
>
> The identification review, assessment and remediation of internal control deficiencies is overseen by senior management and our audit committee, and is undertaken primarily through the integration of processes and procedures with existing Zebra processes and procedures, development and implementation of formal policies, improved processes and documented procedures, as well as the hiring of additional finance personnel.
>
> During the quarter covered by this report, there have been no other changes in our internal controls that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting.

64. In each Form 10-Q and Form 10-K issued thereafter during the Class Period, Zebra identified deficiencies in its internal controls. For example, Zebra's August 13, 2015 quarterly report for the period ended July 4, 2015 (the "2Q15 Form 10-Q"), filed with the SEC on Form 10-Q, which was signed by Defendants Gustafsson and Smiley, stated, in pertinent part, as follows:

> **Evaluation of Disclosure Controls and Procedures**
>
> The Company has conducted an evaluation of the effectiveness of the design and operation of its disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) as of the

> end of the period covered by this Form 10-Q. The evaluation was conducted under the supervision of its Disclosure Committee, and with the participation of management, including the Chief Executive Officer and Chief Financial Officer. Based on that evaluation, ***the Company has concluded that its disclosure controls and procedures were not effective as of July 4, 2015, as a result of a material weakness identified in the first quarter of 2015 related to the process to review and prepare its quarterly income tax provision***.
>
> **Changes in Internal Control over Financial Reporting**
>
> As noted in the 2014 Form 10-K, ***in connection with the Company's initial reviews of internal controls for Enterprise, the Company had identified certain internal control deficiencies related to Enterprise***. The Company continues to identify and review the internal controls of the Enterprise business and is establishing a plan of remediation that is consistent with its obligation to assess the effectiveness of Enterprise's internal controls over financial reporting as of December 31, 2015.

65. Yet, Defendants continued to issue financial guidance to the market. Each quarter, Defendants provided guidance on a host of metrics for the following quarter, including for its gross margins. Defendants knew, or were reckless in disregarding, that there was no reasonable basis for the guidance given the internal control problems they identified.

66. Zebra would later recognize, on February 29, 2016, that the "material weakness relates to deficiencies in the design and operation of controls in response to the increased complexity in the legal entity structure of the business following the Enterprise acquisition. These deficiencies impacted our ability to accurately forecast pretax income and deferred taxes, by legal entity, in a timely manner."

67. According to FE2, internally, the Motorola Enterprise acquisition was referred to as the "guppy swallowing the whale." Yet, FE2 stated that no employees from Motorola's sales or income tax department were brought over to Zebra in connection with the acquisition.

68. Moreover, FE2 stated that, at the time of the acquisition, Zebra had only ***two*** people assigned to handle the day-to-day income tax related assignments ***for the entire Company***. FE2

noted that Zebra's Tax Manager and Tax Director had little day-to-day responsibilities for preparing taxes.

**(d) Zebra Reveals a Shortfall in Its Margin Guidance**

69. On Zebra's May 13, 2015 earnings call with investors, Defendant Smiley provided Zebra's gross margin outlook for the second quarter of 2015, stating, in pertinent part, as follows:

> We expect non-GAAP earnings for the second quarter in the range of $1 to $1.25. ***This forecast assumes gross margin in the range of 45.5% to 46.5%.***

70. On August 11, 2015, Zebra reported its financial results for the second quarter of 2015 and revealed a miss of its previously issued gross margin guidance, coming in at 44.2%, 160 basis points lower than its gross margin for the first quarter of 2015 and well below the level Defendants had led the market to expect for the quarter. Defendants disclosed that the miss was a result of "impact of purchase accounting and one-time accounting adjustments related to Enterprise that adversely affected results" and "expenses associated with the rebranding of products containing the Motorola marks."

71. Analysts commented on the Company's reporting of its earnings and guidance numbers. For example, William Blair stated in an analyst report issued the next day, that Zebra issued a "disappointing earnings result in the second quarter and lower-than-expected guidance for the third quarter. Although second-quarter revenue growth was solid (and in line with expectations), earnings were below expectations driven by a lower-than-expected gross margin." In addition, the William Blair report stated, in pertinent part, as follows:

> Gross margin contracted 150 basis points on a sequential basis . . . to 44.8% [sic]. This was lower than the consensus estimate of 46.4% and below management's guidance range of 45.5%-46.5%. ***Management attributed the lower-than-expected result to purchase accounting and other one-time accounting adjustments related to the acquisition of the enterprise business, which negatively affected gross margin by about 100 basis points***.

72. In response to these disappointing results, the price of Zebra common stock plummeted, falling from $110.04 per share on August 10, 2015 to close at $83.80 per share on August 11, 2015 – a decline of approximately $26.24 per share, or approximately 24%.

73. Nevertheless, Defendants continued to falsely claim during the Class Period that they "remain on track to achieve our target of $150 million of run rate savings by the end of 2016" in connection with the Motorola Enterprise acquisition. In actuality, hundreds of millions of dollars in incremental spending was needed to address systemic problems with the IT systems migration that would largely offset the cost synergies and savings about which Defendants repeatedly boasted during the Class Period.

**(e) Defendants Admit to Integration Issues and the Need to Spend Up to $200 Million to Fix Problems and Complete the Integration**

74. On November 10, 2015, Zebra finally disclosed that it was experiencing problems migrating the IT systems in connection with the Motorola Enterprise acquisition and that substantial incremental spending was necessary to fix them. Specifically, during Zebra's earnings call, Defendant Gustafsson revealed that "***the complexity of the IT systems has been greater than we had expected. Motorola had a bit of a patchwork of systems, a lot of customization. They didn't necessarily all talk to each other***" and "the remaining costs to complete the overall integration program including capital expenditures are expected to be approximately ***$180 million to $200 million*** through 2017."

75. Analysts were quick to react to the news that such a significant amount of spending was needed to complete the integration of the IT systems. In a report to investors on November 10, 2015, analysts at Great Lakes Review discussed the increase in spending and extent of the IT migration problems, stating in pertinent part, as follows:

> Integration efforts going forward will focus on IT infrastructure and business systems implementations, with Zebra planning to move to a single ERP system (from two

> separate Oracle systems) by the end of 2017***, resulting in costs of $180 million-to-$200 million through 2017, including capital expenditures as the complexity of Motorola's IT systems, described as a patchwork of systems that do not communicate well with each other, has been greater-than-anticipated.***

76. In response to this disappointing news, the price of Zebra common stock declined from $82.99 per share on November 9, 2015 to close at $75.78 per share on November 10, 2015 – a decline of approximately $7.21 per share, or approximately 8.7%, on high trading volume of more than 1.5 million shares trading, more than three times greater than the average daily trading volume during the Class Period.

77. Once Defendants revealed the extent of integration-related spending that was still needed, analysts revised their estimates considerably. For example, after the March 17, 2015 earning release, Northcoast Research issued a report stating that Zebra reported $26 million in acquisition and integration costs during the quarter ended March 31, 2015 and that it forecasted ***no*** additional Motorola Enterprise acquisition and integration costs for the balance of 2015. Shortly after the end of Class Period, however, Northcoast Research issued a research report dated November 13, 2015 forecasting ***$111 million*** in Motorola Enterprise acquisition and integration costs during 2015, or $85 million more than it forecasted just seven months prior. These incremental acquisition and integration costs were significant given that Zebra's cash balance at October 3, 2015 totaled only $258 million and its operating income during the nine months ended October 3, 2015 totaled only $31 million.

## DEFENDANTS VIOLATE SEC RULES AND REGULATIONS

### Zebra's Class Period SEC Filings Did Not Comply with SEC Disclosure Regulations

78. Item 7 of Form 10-K and Item 2 of Form 10-Q required Zebra to furnish the information called for under Item 303 of Regulation S-K [17 C.F.R. §229.303], *Management's Discussion and Analysis of Financial Condition and Results of Operations* ("MD&A") during the

Class Period. Among other things, Item 303 of Regulation S-K required that Zebra's Class Period Forms 10-K and 10-Q disclose known events or uncertainties that had, or were reasonably likely to have, a material impact on its revenues or income from continuing operations.

79. The SEC issued interpretative guidance associated with the requirements of Item 303 of Regulation S-K concerning the disclosure of material events or uncertainties. The interpretative guidance states, in pertinent part, as follows:

> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.
>
> * * *
>
> **Events that have already occurred** or are anticipated **often give rise to known uncertainties**. For example, a registrant may know that a material government contract is about to expire. The registrant may be uncertain as to whether the contract will be renewed, but nevertheless would be able to assess facts relating to whether it will be renewed. More particularly, the registrant may know that a competitor has found a way to provide the same service or product at a price less than that charged by the registrant, or may have been advised by the government that the contract may not be renewed. The registrant also would have factual information relevant to the financial impact of non-renewal upon the registrant. **In situations such as these, a registrant would have identified a known uncertainty reasonably likely to have material future effects on its financial condition or results of operations, and disclosure would be required**.

80. The MD&A disclosures in Zebra's Forms 10-K and 10-Q it filed with the SEC during the Class Period were materially false and misleading because Defendants failed to disclose material uncertainties and events associated with integration of Motorola Enterprise, as alleged herein. These undisclosed material uncertainties and events, which were then known to management, were reasonably likely to, and did, have a material effect on the Company's future operating results.

81. In addition, Item 1A of both Form 10-K and Form 10-Q requires SEC registrants to furnish the information called for under Item 503 of Regulation S-K [17 C.F.R. §229.503], *Risk*

*Factors*. Item 503 of Regulation S-K required that Zebra's Class Period Forms 10-K and 10-Q disclose the most significant matters making an investment in Zebra risky.

82. As detailed herein, during the Class Period, Zebra's Forms 10-K and 10-Q made materially false and misleading representations about ***potential*** integration related risks when, in fact, such risks were ***existing*** during the Class Period.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

**November 2014**

83. The Class Period commences on November 4, 2014. On that date, Zebra held a conference call with investors to discuss its financial results for the third quarter of 2014 and provide an update on the Motorola Enterprise acquisition, which had closed the previous week. During the call, Defendant Gustafsson commented on Zebra's plan with respect to cost synergies to be realized in connection with the acquisition, stating, in pertinent part, as follows:

> We will continue to drive momentum and maximize the strength of the new Zebra, as we create the most formidable provider of asset intelligence solutions worldwide. ***At the same time, we are committed to creating shareholder value through achieving $150 million in cost synergies. We expect $100 million of these savings to be realized in operating expenses and $50 million in cost of goods, as we streamline the purchasing of common components and rationalized vendors. Our current plan calls for exiting 2015 with [$50] million to $75 million in captured synergies on a run-rate basis, with the remainder achieved the following year.***

84. The statements referenced above in ¶83 regarding the millions of dollars in cost synergies to be realized in connection with the integration of the Motorola Enterprise business were materially false and misleading when made, because they failed to disclose and/or misrepresented that the cost savings would largely be offset by the significant expenses Zebra had to make to integrate the systems of Motorola Enterprise, which Defendants knew, or recklessly disregarded.

85. In addition, during the call, Defendant Gustafsson commented on the integration to Zebra's ERP system, stating, in pertinent part, as follows:

> ***By the time of closing, we successfully completed a complex cut-over to the ERP system supporting the enterprise business in a short amount of time. Our hard work ahead of the close enabled us to take orders and ship products at volume from day one. We have already made significant progress on integrating the enterprise business***.

86. The statements referenced above in ¶85 regarding Zebra's ERP system and the "significant progress" regarding the integration of the Motorola Enterprise business were each materially false and misleading when made because they failed to disclose and/or misrepresented the following adverse facts that Defendants knew or recklessly disregarded at the time the statements were made:

(a) the process of extracting data related only to Motorola Enterprise from Motorola's systems and merging it onto Zebra's ERP system was plagued with problems;

(b) the efforts of Zebra's Tax Department were severely undermined due to the difficulties in obtaining sales data and accounting information from Motorola and inputting it into the existing ERP system at Zebra;

(c) the mandate to combine the sales forces and compensation plans of Motorola Enterprise and Zebra by January of 2015 was a rushed process that was hampered by problems associated with aligning the data of the two different companies, requiring additional resources to attempt to sort through data; and

(d) as a result of these issues, Zebra faced serious issues with the integration of the much larger Motorola Enterprise business.

87. The following week, on November 11, 2014, Defendant Smiley represented Zebra at Robert W. Baird & Co. Inc.'s Industrial Conference. During his presentation, Defendant Smiley discussed the integration to Zebra's ERP system, in pertinent part, as follows:

> The integration is well underway. We actually obviously closed the transaction a couple weeks ago. ***One thing we are really excited about is we turned onto ERP systems -- is we had to clone what we acquired. And we turned it on, and it's***

> ***functioning really well. I'm going to tell you that's not a small feat. But I think that's another testimony to the fact that we can execute well. So that's working well for us*.**

88. The statements referenced above in ¶87 representing that Zebra's ERP system was "functioning really well" and that it was "working really well for us" were each materially false and misleading for the reasons set forth in ¶86.

89. The next day, on November 4, 2014, Zebra filed its quarterly report for the period ended September 27, 2014 with the SEC on Form 10-Q (the "3Q14 Form 10-Q"), which was signed by Defendants Gustafsson and Smiley. The 3Q14 Form 10-Q contained, *inter alia*, the following MD&A disclosure:

> *Operating Expenses*
>
> Operating expenses for the third quarter increased 52.2% primarily due to acquisition and integration costs related to the acquisition of the Enterprise business of Motorola Solutions, which was announced in April 2014. Zebra completed the transaction on October 27, 2014.

90. The statement referenced in ¶89 above regarding increased operating expenses "primarily due to acquisition and integrations costs related to the acquisition of the Enterprise business of Motorola Solutions" was materially false and misleading when made because Defendants failed to disclose that Zebra was reasonably likely to incur substantial additional costs on a going forward basis that would have a material adverse effect on the Company's operating results, which they knew, or were reckless in not knowing.

91. In addition, the 3Q14 Form 10-Q contained, *inter alia*, the following risk disclosures:

> **We may be unable to effectively integrate the Enterprise business into our existing business after the Acquisition.**
>
> We cannot assure you that we will be able to integrate the Enterprise business effectively into the Company. The integration of the Enterprise business, which is significantly larger than our existing business, into our operations will be a significant undertaking and will require significant attention from our management. The Acquisition, with an approximate enterprise value of $3.45 billion, is

> significantly larger than prior acquisitions we have completed and will significantly increase the size of our operations, increase our number of employees and operating facilities and expand our geographic scope. There can be no assurance that we will be able to successfully integrate the Enterprise business, or if such integration is successfully accomplished, that such integration will not be more costly than presently contemplated. There can also be no assurance that we can successfully manage the combined business due to our greatly increased size and scope. If we cannot successfully integrate and manage the Enterprise business within a reasonable time following the Acquisition, we may not be able to realize the potential and anticipated benefits of the acquisition, which could have a material adverse effect on our business, financial condition, operating results, cash flows and growth prospects.
>
> **We may be unable to realize the expected growth opportunities and cost savings from the Acquisition.**
>
> In connection with the integration of the Enterprise business into our existing operating structure, we will seek to realize growth opportunities, along with cost savings. We currently expect to realize cost savings of approximately $150 million per year to be fully achieved by 2017. The anticipated cost savings are based upon assumptions about our ability to implement integration measures in a timely fashion and within certain cost parameters. Our ability to achieve the planned cost synergies is dependent upon a significant number of factors, some of which may be beyond our control. For example, we may be unable to eliminate duplicative costs in a timely fashion or at all. Our inability to realize anticipated cost savings, and revenue enhancements from the acquisition could have a material adverse effect on our business, financial condition, operating results, cash flows and growth prospects.
>
> **The Acquisition could divert the attention of management.**
>
> If we complete the Acquisition, we will be entering new lines of business that we lack experience managing. Similarly, because the Enterprise business is significantly larger than our existing business, we will be required to manage new and larger lines of business, and consequently the integration process will require significant attention from management, which may divert management's attention from our existing businesses. Management may also have difficulty assimilating the corporate cultures, maintaining employee morale and retaining key employees. These diversions, together with other difficulties we may have integrating the Enterprise business, could have a material adverse effect on our business, financial condition, operating results, cash flows and growth prospects.

92. The risk factors referenced in ¶91 above were materially false and misleading when made because they failed to disclose and/or misrepresented the following adverse facts that Defendants knew or recklessly disregarded at the time the statements were made:

(a) Zebra was *already* facing significant problems with its integration that were impacting its ability to "effectively integrate the Enterprise business." For example, the process of extracting data related only to Motorola Enterprise from Motorola's systems and merging it onto Zebra's ERP system was plagued with issues;

(b) the "cost savings" and "cost synergies" realized from the Motorola Enterprise acquisition in the short run would largely be offset by hundreds of millions of dollars in incremental spending necessary to complete the acquisition and to remedy severe and undisclosed problems encountered during the migration from Motorola-supported IT systems to those of Zebra's; and

(c) these aforementioned material and undisclosed problems were *already* "divert[ing] the attention of management."

**March 17, 2015**

93. On March 17, 2015, Zebra issued a press release announcing announced its financial results for the fourth quarter of 2014 and full year, the periods ended December 31, 2014, in a press release (the "3/17/15 Press Release"). The same day, Zebra held a conference call with analysts and investors, making additional positive statements about the Motorola Enterprise acquisition and integration, the Company's business metrics and financial prospects.

94. During the call, Defendant Gustafsson commented on Zebra's cost synergies and savings in connection with the Motorola Enterprise acquisition, stating, in pertinent part, as follows:

> ***We are moving forward on plan with the integration, and we remain confident in our ability to achieve $150 million in cost synergies over two years***.
>
> * * *
>
> ***We are on target to achieve the $150 million in synergies by the end of 2016, with $50 million to $75 million in savings this year***.

95. The statements referenced above in ¶94 that Defendants were "confident in our ability to achieve $150 million in cost synergies" and that "$50 million to $75 million in savings this year"

in connection with the acquisition of the Motorola Enterprise business would be "achieved" were materially false and misleading when made, because they failed to disclose and/or misrepresented that the cost savings would largely be offset by the significant expenses Zebra had to make to integrate the systems of Motorola Enterprise, which Defendants knew, or recklessly disregarded.

96. Defendant Gustafsson also commented on the status of the integration stating, in pertinent part, as follows:

> ***Since the enterprise acquisition closed on October 27, we have been very pleased with the progress of our integration efforts, and the resulting success***. Since day one, we were able to book and ship product in quantity. Our employees are energized, and despite the complexities of the transaction, they have remained focused on serving our customers and partners, and growing the business. ***The two businesses are coming together quickly***, with the goal of building an organization that is uniquely positioned to serve the visibility needs of partners and customers around the globe. ***The integration is progressing as planned***.

97. The statements referenced above in ¶96 that Defendants were "very pleased with the progress of the integration," that "the two businesses are coming together quickly, and that "the integration is progressing as planned" were each materially false and misleading when made because they failed to disclose and/or misrepresented the following adverse facts that Defendants knew or recklessly disregarded at the time the statements were made:

(a) the process of extracting data related only to Motorola Enterprise from Motorola's systems and merging it onto Zebra's ERP system was plagued with problems;

(b) the efforts of Zebra's Tax Department were severely undermined due to the difficulties in obtaining sales data and accounting information from Motorola and inputting it into the existing ERP system at Zebra;

(c) the mandate to combine the sales forces and compensation plans of Motorola Enterprise and Zebra was a rushed process that was hampered by problems with integrating the data

of the two different companies, requiring additional staff to attempt to sort through data, which Defendants declined to hire; and

(d) as a result of these issues, Zebra faced serious issues with the integration of the much larger Motorola Enterprise business.

98. Also on the conference call, Defendant Gustafsson discussed the integration of the Motorola Enterprise and Zebra's sales forces, stating, in pertinent part, as follows:

> ***We have already completed the integration of the sales force under Joe, and we have aligned the right people in the right roles***.

99. The statement referenced above in ¶98 regarding the integration of the sales forces was materially false and misleading when made because it failed to disclose and/or misrepresented the following adverse facts that Defendants knew or recklessly disregarded at the time the statements were made:

(a) combining the sales forces and compensation plans of Motorola Enterprise and Zebra was being hampered by problems associated with the alignment of data between the two different companies; and

(b) the hiring of additional staff to sort through these data issues was an urgent necessity, but Defendants ignored repeated requests to hire them.

100. Also on March 17, 2015, Zebra filed the 2014 Form 10-K, which was signed by Defendants Gustafsson and Smiley. The 2014 Form 10-K repeated, in all material respects, the same MD&A and risk factor disclosures as the 3Q14 10-Q, which were false and misleading for the reasons discussed in ¶¶90, 92.

**May 13, 2015**

101. On May 13, 2015, Zebra announced its financial results for the three months ended April 4, 2015, in a press release, which it filed with the SEC on Form 8-K (the "5/13/15 Press

Release"). In the 5/13/15 Press Release, defendant Gustafsson commented on the cost synergies and integration of the Motorola Enterprise acquisition, stating in pertinent part as follows:

> During the quarter ***we also made material progress on achieving our cost-synergy targets, pursuing growth initiatives and integrating Zebra with the Enterprise business acquired from Motorola Solutions in October***.

102. The statements referenced above in ¶101 that "material progress" had been made in "achieving our cost synergy targets" and "integrating Zebra with the Enterprise business" were materially false and misleading when made because it failed to disclose and/or misrepresented the following adverse facts that Defendants knew or recklessly disregarded at the time the statements were made:

(a) any cost savings Zebra recognized would largely be offset by the significant expenses Zebra had to incur to integrate the systems of Motorola Enterprise and rebrand the business;

(b) combining the sales forces and compensation plans of Motorola Enterprise and Zebra was hampered by problems integrating data between the two different companies; and

(c) the hiring of additional staff to sort through these data issues was an urgent necessity, but Defendants ignored repeated requests to hire them.

103. Following the issuance of the 5/13/15 Press Release, Zebra held a conference call with analysts and investors to discuss the Company's financial performance. Defendants Gustafsson and Smiley, among others, participated in the call and reiterated the Company's financial results as set forth in the 5/13/15 Press Release. In his prepared remarks, Defendant Gustafsson discussed the Company's integration, cost synergies, and savings relating to the Motorola Enterprise acquisition, stating, in pertinent part, as follows:

> ***We also made meaningful progress on our synergy, integration, and growth goals. . . . To date, we have achieved $50 million in cost synergies on an annualized basis, related to the acquisition***. In addition to completing the sales

> force consolidation, in order to present a solid unified approach to the customer, we have merged several facilities, rationalized part of our supply chain organization, and achieved cost savings from reducing the number of services provided under the transition services agreement with Motorola. This progress reinforces our confidence in our capacity to meet or exceed our long-term growth, profit and debt leverage objectives.

104. The statements referenced above in ¶103 that "meaningful progress" had been made on "synergy" and "integration" and that the Company had "achieved cost savings" were materially false and misleading for the reasons stated in ¶102.

105. Also on the May 13, 2015 conference call, Defendant Smiley discussed Foreign Exchange ("FX") "headwinds" the Company would be experiencing in the upcoming quarter, but that they would be offset by sales and cost synergies, stating, in pertinent part, as follows:

> Our guidance also incorporates a minor sequential FX headwind. In late April, we implemented a price increase on Euro-denominated sales. The initial effect of the increase has not had a meaningful impact on our business, which is consistent with our expectations. It will have a minor positive effect on second-quarter sales, with a more pronounced impact in the second half of this year. ***Combined with our trajectory on sales and cost synergies, we expect to offset much of the currency headwinds that are affecting the business in the near term***.

106. The statement referenced above in ¶105 that cost synergies would contribute to an "offset" for currency headwinds was materially false and misleading when made, because cost synergies themselves would largely be offset by the significant expenses Zebra had to incur to integrate the systems of Motorola Enterprise and rebrand the business, which Defendants knew, or recklessly disregarded.

107. During the call, Defendant Smiley elaborated on the Company's cost synergies and run rate savings, stating in pertinent part, as follows:

> First-quarter EBITDA reflects good progress on our synergy efforts, and we are close to our goal of achieving an 18% to 20% EBITDA margin. ***To date, we have captured approximately $50 million in run rate savings, and remain on track to achieve our target of $150 million of run rate synergies by the end of 2016***. In addition, we believe the potential exists to achieve even more synergies beyond the two-year time frame.

108. The statement referenced above in ¶107 that Zebra had "captured approximately $50 million in run rate savings" and that the Company was "on track to achieve our target of $150 million of run rate synergies by the end of 2016" was materially false and misleading when made because it failed to disclose and/or misrepresented that any savings Zebra achieved would largely be offset by the significant expenses Zebra had to make to integrate the systems of Motorola Enterprise and rebrand the business, which Defendants knew, or recklessly disregarded.

109. In addition, on the May 13, 2015 conference call, Defendant Smiley provided Zebra's gross margin outlook for the second quarter of 2015, stating, in pertinent part, as follows:

> We expect non-GAAP earnings for the second quarter in the range of $1 to $1.25. ***This forecast assumes gross margin in the range of 45.5% to 46.5%.***

110. The gross margin guidance referenced above in ¶109 was materially false and misleading when made because Defendants knew or recklessly disregarded:

(a) that the Company still faced significant expenses associated with the rebranding of products containing the Motorola marks, which was directly impacting Zebra's margins;

(b) that purchase accounting adjustments relating to the acquisition of Motorola Enterprise were necessary and would impact Zebra's margins; and

(c) because of the deficiencies in Zebra's internal controls over financial reporting, Defendants lacked a reasonable basis to provide this guidance to the market.

111. During the question and answer portion of the conference call, Defendants were asked by an analyst about cost synergies and run rate savings. Defendant Smiley's exchange with that analyst was, in pertinent part, as follows:

> **Brian Drab - William Blair & Company - Analyst**
>
> I just wanted to first ask about the cost synergies, and what do you expect the run rate in savings to be by the end of 2015? And could you elaborate on what you meant by,

I think you used the phrasing more synergies in future years . Is that more beyond the $150 million?

**Mike Smiley - Zebra Technologies Corporation - CFO**

***So Brian, I think we've been saying that by the end of the year, we'll have $70 million-ish at the end of the year. I wouldn't be surprised if we do slightly better than that. I think we're on a good run rate so far.***

***The synergies beyond two years, we expect to have our ERP system integrated by the end of two years. And I think the value of that will allow us to be working on one system, which will take a little bit of burden off of the back end that supports all of our work, and so we expect to have some further modest improvement, as a result of being on one ERP system.***

**Brian Drab - William Blair & Company - Analyst**

And that's potential upside to the $150 million?

**Mike Smiley - Zebra Technologies Corporation - CFO**

Yes, yes.

112. The statements referenced above in ¶111 regarding Zebra's run rate, cost synergies, and ERP system integration were materially false and misleading when made because they failed to disclose and/or misrepresented the following adverse facts that Defendants knew or recklessly disregarded at the time the statements were made:

(a) that any cost savings Zebra recognized would largely be offset by the significant expenses Zebra had to make to integrate the systems of Motorola Enterprise and rebrand the business; and

(b) that the process of extracting data related only to Motorola Enterprise from Motorola's systems and merging it onto Zebra's ERP system was plagued with problems and required the expenditure of significantly more money to successfully complete the integration.

113. The next day, on May 14, 2015, Zebra filed its quarterly report for the period ended April 4, 2015 with the SEC on Form 10-Q ("the 1Q15 Form 10-Q"), which was signed by Defendants Gustafsson and Smiley. The 1Q15 Form 10-Q incorporated the risk factor disclosures

identified in Zebra's 2014 Form 10-K, which were false and misleading for the reasons discussed in ¶¶90, 92. The 1Q15 Form 10-Q also repeated, in all material respects, the MD&A disclosures identified in the 3Q14 Form 10-Q, which were false and misleading for the reasons discussed in ¶¶90, 92. In addition, the 1Q15 Form 10-Q contained the following disclosure in its MD&A section.

> Enterprise Gross Profit
>
> Gross profit for Enterprise in the first quarter of 2015 was $244.6 million. Gross margin for Enterprise for the first quarter of 2015, was 43.1% of sales.
>
> The gross profit margin was adversely affected by the strengthening of the U.S. dollar and higher service costs. Excluding currency effects, hardware gross profit margin was relatively consistent with recent trends while service margin was lower. The mix of hardware and services sales was essentially consistent with recent trends.

114. The disclosure referenced in ¶113 above was materially false and misleading when made because, as of May 14, 2015, the second quarter of 2015 (which ended on July 4, 2015) was nearly half complete and, in light of the Company's forthcoming announcements, Defendants knew, or were reckless in not knowing, that the rebranding of products containing the Motorola marks and purchase accounting adjustments relating to the acquisition of Motorola were directly impacting Zebra's margins, which Defendants should have disclosed to investors.

**Second Quarter 2015 Financial Results**

115. On August 11, 2015, Zebra issued a press release announcing its second quarter 2015 financial results for the three months ended July 4, 2015, which it filed with the SEC on Form 8-K (the "8/11/15 Press Release"). In the 8/11/15 Press Release, Zebra reported, *inter alia*, that gross margins for the second quarter of 2015 came in 160 basis points lower than its gross margins for the first quarter of 2015 and well below the level Defendants had led the market to expect for the quarter. Specifically, the 8/11/15 Press Release stated, in pertinent part, as follows:

> Gross margin for the second quarter of 2015 of ***44.2%*** includes an increase to costs of sales associated with purchase accounting adjustments, costs associated with the rebranding of Motorola product, as well as other costs not expected to recur. The

> purchase accounting adjustments and other cost factors negatively impacted gross margin percentage by approximately 1.1 percentage points. Compared to the 49.3% gross margin in the second quarter of 2014, gross margin percentage also reflects a change in mix associated with the sale of Enterprise products which generally have a lower gross margin than pre-transaction Zebra products and the impact of foreign currency movements, net of hedges.

116. Following the issuance of the 8/11/15 Press Release, Zebra held a conference call with analysts and investors to discuss the Company's financial performance. Defendants Gustafsson and Smiley, among others, participated in the call and reiterated the Company's financial results as set forth in the 8/11/15 Press Release.

117. In his prepared remarks, Defendant Smiley commented on Zebra's lower than expected gross margin for the quarter, stating, in pertinent part, as follows:

> Gross margin for the quarter was ***44.2%***. This reflects the impact of purchase accounting and one-time accounting adjustments related to Enterprise that adversely affected results. Additionally, we incurred expenses associated with the rebranding of products containing the Motorola marks. Product rebranding activities will continue according to the staggered cutover schedule through the end of next year. However, we expect the majority of this effort and the associated costs to be completed by the end of this year.

118. Analysts commented on the Company's reporting of its earnings and guidance numbers. For example, William Blair stated in an analyst report issued the next day, that Zebra issued a "disappointing earnings result in the second quarter and lower-than-expected guidance for the third quarter. Although second-quarter revenue growth was solid (and in line with expectations), earnings were below expectations driven by a lower-than-expected gross margin." In addition, the William Blair report stated, in pertinent part, as follows:

> Gross margin contracted 150 basis points on a sequential basis . . . to 44.8% [sic]. This was lower than the consensus estimate of 46.4% and below management's guidance range of 45.5%-46.5%. ***Management attributed the lower-than-expected result to purchase accounting and other one-time accounting adjustments related to the acquisition of the enterprise business, which negatively affected gross margin by about 100 basis points***.

119. In addition, analysts at Wells Fargo issued a report the same day discussing the Company's gross margins, in pertinent part, as follows:

> **Gross Margin (GM) Light On F/X, Mix Shift & One-Time Impacts** – The Q2 gross margin shortfall was a disappointment. Investor concerns were on Zebra's ability to hit revenue targets, but there was little concern on margin into Q2. ***Zebra's ability to forecast Q2 gross margin and to account for controllable expenses like Motorola re-branding expenses led to investors placing a greater discount on the company's long-term margin guidance***. The company indicated that EBITDA margin would have been 19% in Q2 on a constant currency basis, which implies margin would be above 20% with full synergies. However, Zebra would not say on the call that it expects to recoup the entire margin lost to the stronger dollar even after price increases are implemented and component prices are renegotiated. We think the company is likely to recoup the lost margin and should bring EBITDA margin at least to the high-end of the guidance range, but for now the Street is less confident that Zebra can hit its margin guidance.

120. In response to these disappointing results, the price of Zebra common stock declined from $110.04 per share on August 10, 2015 to close at $83.80 per share on August 11, 2015 – a decline of approximately $26.24 per share, or approximately 24%. The Company's stock price, however, remained artificially inflated because Defendants continued to mislead the market with respect to the status of the integration of IT systems and cost synergies in connection with the Motorola Enterprise acquisition.

121. For example, during the August 11, 2015 call, Defendant Smiley touted the purported savings and cost synergies in connection with the Motorola Enterprise acquisition, as follows:

> ***To date, with our focus on our cost synergy programs, improvements in operating leverage, we have captured approximately $60 million of savings and remain on track to achieve our target of $150 million of run rate savings by the end of 2016***.

122. The statements referenced in ¶121 above, that Defendants had "captured approximately $60 million of savings" and that they "remain[ed] on track to achieve our target of $150 million of run rate savings by the end of 2016" in connection with the integration of the Motorola Enterprise business were materially false and misleading when made because they failed to disclose and/or misrepresented that any cost savings would largely be offset by the nearly $200

million in costs that were necessary to rectify serious problems with the IT systems migration, which Defendants knew, or recklessly disregarded.

123. In addition, during the call, Defendant Smiley discussed Zebra's investment in IT and its integration efforts, in an exchange with an analyst, in pertinent part, as follows:

> **Richard Eastman - Robert W. Baird & Co. – Analyst:**
>
> Okay. And then, just a second question, maybe for Mike. Could you address the free cash flow year-to-date? And maybe there's a couple big tax payments made in each of the quarters, if that continues. But how does the -- can you give us any sense of what the free cash flow should look like for the full year?
>
> **Michael Smiley - Zebra Technologies Corporation – CFO:**
>
> Yes. I guess, the big thing I would say is that, we certainly have big tax payments that go out in the second quarter, so that affected our cash flow. The other thing is, if you -- if we can get you to come visit us here in Lincolnshire, we moved into a new consolidated business which drove some leasehold improvements, which is more or less a lot of it's behind us, which drove some of the CapEx numbers.
>
> So generally -- and as we go forward, ***I would say we will continue to invest in integrating the Company, that's primarily from an IT standpoint***. So I would expect, though the first half had a meaningful part of leasehold improvement, the second half ***we will continue on with ERP integration activities***. So again, I don't expect that the tax payments to be as meaningful as it was the second half. I would expect cash -- the CapEx to be somewhat, maybe a little bit lower in the second half than the first half, because of the building leasehold improvements we made in the first half.

124. The statements referenced above in ¶123 that Zebra would "continue to invest in integrating the Company, that's primarily from an IT standpoint" and that the Company would "continue on with ERP integration activities" were materially false and misleading when made because they failed to disclose the significant problems that Zebra then-currently faced with respect to the integration of its IT systems and that the needed investment amounted to nearly $200 million, which Defendants knew, or recklessly disregarded.

125. Two days later, on August 13, 2015, Zebra filed the 2Q15 Form 10-Q with the SEC, which was signed by Defendants Gustafsson and Smiley. The 2Q15 Form 10-Q contained false and misleading MD&A and risk factor disclosures. *See* ¶¶90, 92.

**Third Quarter 2015 Financial Results**

126. On November 10, 2015, Zebra issued a press release announcing its third quarter 2015 financial results for the three months ended October 3, 2015, which it filed with the SEC on Form 8-K (the "11/10/15 Press Release"). Following the issuance of the 11/10/15 Press Release, Zebra held a conference call with analysts and investors to discuss the Company's financial performance. Defendants Gustafsson and Smiley, among others, participated in the call. In his prepared remarks, Defendant Gustafsson revealed that a massive incremental spend to complete the IT systems migration in connection with the Motorola Enterprise acquisition was needed.

> We expect to complete the systems migration, and be entirely off Motorola-supported IT systems before the end of 2017. The remaining costs to complete the overall integration program including capital expenditures are expected to be approximately ***$180 million to $200 million*** through 2017.

127. In addition, during the call, Defendant Gustafsson was asked by an analyst about this substantial increase in spending and revealed previously undisclosed issues in connection with the IT systems migration. Defendant Gustafsson's exchange with the analyst about this was, in pertinent part, as follows:

> **Andrew Spinola - Wells Fargo Securities, LLC – Analyst:**
>
> And just a clarification. I think, Anders, you made the comment, that there's another $180 million to $200 million of integration and acquisition spend between now and 2017, did I catch that correctly?
>
> **Anders Gustafsson - Zebra Technologies Corporation – CEO:**
>
> That's correct. That includes then, all the IT spend, including CapEx also. And we also said that would help yield substantial efficiencies past the 2017 date. So as we get into 2018, and so we expect to drive further operating leverage based on those investments.

**Andrew Spinola - Wells Fargo Securities, LLC – Analyst:**

Just stepping back from my perspective, it does seem like -- I'm a little surprised the acquisition and integration spend was the highest this year in the third quarter. I would have thought it would be stepping down. And then, the fact that there's another $180 million to $200 million sounds like a good bit more than I was looking for. And so, I'm just wondering, did it turn out that there's more opportunities for things that you could optimize? Or maybe on the flip side, it turned out that Motorola needed more investment than was initially expected?

**Anders Gustafsson - Zebra Technologies Corporation – CEO:**

Well, first, we are very pleased for the efforts to date on integration. We feel that the integration has gone very, very well for us. There -- if you look at things like the -- how we designed and integrated a new sales organization, I think that was done very, very well. The -- there we had basically a blank sheet of paper that we started with, and we didn't really merge the organizations, but it was very stressful as we went through it. But looking back, I think we very quickly got the right team, knowing their roles, and we were out focusing on selling. . . .

***But on the negative side, I would say, the complexity of the IT systems has been greater than we had expected. Motorola had a bit of a patchwork of systems, a lot of customization. They didn't necessarily all talk to each other. So as we pull this together, we're looking to see how we can create the platform that's across all of Zebra, to drive the right level of efficiencies to then -- to continue to generate great operating leverage benefits after we're done with this***.

128. Analysts reacted negatively to the news disclosed on November 10, 2015 that significant incremental spending was needed to address problems in connection with the Motorola Enterprise IT systems integration. For example, analysts at J.P. Morgan issued a report on November 11, 2015 commenting on the increased IT integration spending, in pertinent part as follows:

ZBRA now targets $200 million of synergies from the MSI acquisition by 2016 year-end, up from $150 million; ***positive news that is offset by an increase in one-time integration costs and re-investment in growth***, which weights [sic] on quality of earnings and is making it difficult to be confident in the time-line and magnitude of the pay-back on this intense activity.

* * *

The firm expects to hit 4-5% long term growth, 18-20% PF EBITDA margins, and leverage ratio below 3x by 2017. The firm expects total ~$200mm in cost synergies

by 2016. ***That said incremental acquisition related costs of $180-$200mm (10-15% in capex) was an unwelcome surprise, as IT integration with MSI is proving more costly than expected***.

129. Also, in a report to investors on November 10, 2015, analysts at Great Lakes Review discussed the increase in spending and extent of the IT migration problems, stating in pertinent part, as follows:

> Integration efforts going forward will focus on IT infrastructure and business systems implementations, with Zebra planning to move to a single ERP system (from two separate Oracle systems) by the end of 2017***, resulting in costs of $180 million-to-$200 million through 2017, including capital expenditures as the complexity of Motorola's IT systems, described as a patchwork of systems that do not communicate well with each other, has been greater-than-anticipated.***

*130.* In addition, analysts at Wells Fargo issued a report on November 13, 2015, discussing the unexpected increase in integration costs, in pertinent part, as follows:

> **Integration Spend Well Above Expectations** – Our expectations were that Zebra would spend about $150MM on the integration, but the company has already spent $220MM on Acquisition & Integration costs and $41MM in Exit and Restructuring costs and announced on the conference call that it still has another $180-$200MM of integration opx and capx remaining.

131. In response to this disappointing news, the price of Zebra common stock declined from $82.99 per share on November 9, 2015 to close at $75.78 per share on November 10, 2015 – a decline of approximately $7.21 per share, or approximately 8.7%, on high trading volume of more than 1.5 million shares trading, more than three times greater than the average daily trading volume during the Class Period.

132. As a result of Defendants' false and misleading statements, Zebra common stock traded at artificially inflated prices during the Class Period. However, after the above revelations seeped into the market, the price of Zebra common stock declined significantly, sending Zebra's stock price down ***36%*** from its Class-Period high.

## POST-CLASS PERIOD DEVELOPMENTS

133. On February 29, 2016, Zebra filed its annual financial report on Form 10-K with the SEC for its fiscal year 2015 (the "2015 Form 10-K"), reiterating, *inter alia*, that Zebra had identified defects in its internal controls dating back to the first quarter of 2015, but, for the first time, provided specific information on the serious impact these deficiencies had on its ability to accurately prepare its financial statements. Specifically, the 2015 Form 10-K stated in pertinent part as follows:

> **Management's Report on Internal Control over Financial Reporting**
>
> Our management is responsible for establishing and maintaining adequate internal controls over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act to provide reasonable assurance regarding the reliability of our financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Our management assessed the effectiveness of our internal controls over financial reporting as of December 31, 2015. In making this assessment, our management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control-Integrated Framework as released in 2013. ***Based on this assessment, our management believes that, as of December 31, 2015, our internal controls over financial reporting were not effective, due to the identification of a material weakness***.
>
> A material weakness is a deficiency, or combination of deficiencies, in the internal controls over financial reporting such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis.
>
> ***As of the first quarter of 2015, the Company identified a material weakness related to the process to prepare and review its quarterly and annual income tax provision. The material weakness relates to deficiencies in the design and operation of controls in response to the increased complexity in the legal entity structure of the business following the Enterprise acquisition. These deficiencies impacted our ability to accurately forecast pretax income and deferred taxes, by legal entity, in a timely manner***.

134. In addition, on May 10, 2016, during a conference call with analysts and investors, Defendant Smiley disclosed that certain commissions, which should have been accrued during fiscal year 2015, had not been accrued and were instead being accounted for in the first quarter of 2016.

135. On August 19, 2016, Zebra filed a Form 8-K with the SEC detailing a personnel shuffle in its accounting department. Specifically, in the Form 8-K, Zebra announced that "[e]ffective August 15, 2016, the Board of Directors appointed Colleen O'Sullivan as the Chief Accounting Officer ("CAO") for Zebra Technologies Corporation." The Form 8-K further disclosed that "Michael Smiley, Zebra's Principal Financial Officer, has served in an interim capacity as Zebra's Principal Accounting Officer since April 6, 2016."

136. On November 1, 2016, Zebra filed a Form 8-K with the SEC stating the financial statements contained in its annual reports on Form 10-K for the fiscal year ended December 31, 2015 and quarterly reports on Form 10-Q for the three months ended April 2, 2016 and three and six months ended July 2, 2016 "***should no longer be relied upon because of prior period errors in such financial statements.***" The Form 8-K disclosed that "***Zebra will restate such financial statements to correct the combined effect of the financial statement errors***."

137. Analysts were quick to react following Zebra's announcement of the restatement. For example, that same day, Great Lakes Review issued an analyst report stating, in pertinent part, as follows:

> Zebra, the leader in specialty printers, scanners and mobile computers, is restating its 2015 GAAP results. As previously disclosed in the 2015 Form 10-K, in 1Q15, Zebra identified a material weakness in its internal control over financial reporting related to reviewing and preparing quarterly income taxes. ***Previous identified items totaling $11 million pre-tax (expenses incurred in 2016 that should have been booked in 2015) were deemed immaterial. However, with additional items for 2015 discovered, the total amount now becomes material, so Zebra is "wiping the slate clean" for 2015 by restating the old and new errors***. The result will be a <u>maximum</u> GAAP after-tax loss of up to $35 million for 2015 (including the amount noted above), expected to be completed by November 15th, when Zebra will report 3Q16 results.

138. The Great Lakes Review report also noted that Zebra had finally taken certain steps to bolster its woefully inadequate accounting department, stating in pertinent part, as follows:

> Zebra has already taken steps to address the weakness, including adding a new VP of Tax in the Spring of 2016 – Susan Clifford, previously over 10 years with Matthews International . . . and two new team members to work with Ms. Clifford; as well as a new Chief Accounting Officer in August 2016 (the previous left for health reasons) – Colleen O'Sullivan, previously with Career Education Corporation.

139. Also on November 1, 2016, Northcoast Research issued an analyst report discussing Zebra's numerous accounting issues, including its reporting systems and the inadequacy of its staffing levels. The Northcoast Research report stated in pertinent part as follows:

> **The Restatement** – ***We knew the accounting department at Zebra was undermanned following the Enterprise acquisition as a result of no senior level financial executives joining Zebra from Motorola and their underlying reporting systems the company inherited were a disaster***. The company previously disclosed internal control issues in the area of income taxes and sales commission errors. ***Frankly, we were surprised they did not previously restate results***. We knew why, they hoped to avoid the negative implications a restatement brings, but ultimately they had to anyways, and until their systems are properly updated, there is still the potential for additional accounting errors.

140. On November 14, 2016, Zebra issued a press release announcing that the Company had completed its restatement and filed its Annual Report on Form 10-K/A for the fiscal year ended December 31, 2015, as well as its amended Quarterly Reports on Form 10-Q/A for the periods ended April 2, 2016 and July 2, 2016.

141. The next day, November 15, 2016, Zebra filed a Form 8-K with the SEC announcing that Defendant Smiley, who had served as the Company's CFO since May 1, 2008, was "stepping down as Chief Financial Officer to pursue other opportunities," and was being replaced by Olivier Leonetti.

## ADDITIONAL SCIENTER ALLEGATIONS

142. As alleged herein, Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company (or in their own name) were materially false and misleading; knew or recklessly disregarded, that such statements or documents would be issued or disseminated to the investing

public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Zebra, their control over, and/or receipt and/or modification of Zebra's admittedly materially false and misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

143. Because of their positions within Zebra, Defendants Gustafsson and Smiley had access to non-public information about the Company's business, operations, operational trends, financial statements, markets, and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, these Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

144. Defendants Gustafsson and Smiley, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, income taxes, financial statements, and financial condition, as alleged herein. As Defendant Gustafsson himself noted during Zebra's May 10, 2016 earning call, "[f]rom the beginning we've had a very structured process to ensure a successful integration. We established an internal business transformation office, or BTO, to oversee the execution of the integration. ***The BTO has executive management and Board oversight***, as well as external resources to ensure that we implement best practices."

145. It is appropriate to treat Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of the Defendants identified above. Defendants Gustafsson and Smiley were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

146. As officers and controlling persons of a publicly-held company whose securities were registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, and which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market prices of the Company's common stock would be based upon truthful and accurate information. Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

147. The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their executive and managerial positions and/or Board membership with Zebra, the Individual

Defendants each had access to the adverse undisclosed information about Zebra's business and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Zebra and its business materially false and misleading.

148. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. The Individual Defendants were provided with copies of the documents alleged herein to be misleading before or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public statements detailed herein and are, therefore, primarily liable for the representations contained therein.

149. Each Defendant is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Zebra common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Zebra's integration of Motorola Enterprise; and (ii) caused Plaintiff and the Class to purchase Zebra's common stock at artificially inflated prices.

150. In addition, Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent activity alleged herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the officers at the highest levels of the Company, including Defendants Gustafsson and Smiley.

151. For example, Defendants Gustafsson and Smiley were executive officers of Zebra and, at a minimum, would have been aware of key facts related to the Company's operations. Defendant Gustafsson as the Company's CEO and Defendant Smiley as CFO would have been aware of the serious issues Zebra was experiencing with the integration, in particular with its IT systems. Accordingly, scienter can be imputed to Defendants on this basis.

152. Defendants' positive statements regarding the integration of Motorola Enterprise were lacking in a reasonable basis at all times because, in reality, Zebra was hampered with significant issues integrating the two companies. Specifically, the process of extracting data related only to Motorola Enterprise from Motorola's systems and merging it onto Zebra's ERP system was challenging, not progressing as Defendants led the market to believe, and would cost the Company an additional $180 to $200 million to fix. In addition, the mandate to combine the sales forces and compensation plans of Motorola Enterprise and Zebra by January of 2015 was a rushed process that was hampered by problems associated with aligning the data of the two different companies, requiring additional personnel to attempt to sort through data. FE1 recalled being on a telephone call in 2015 with Defendant Gustafsson and Mike Terzich, Zebra's Chief Administrative Officer, to discuss the issue of bringing on temporary staff to help resolve some of the data issues. FE1 also reported that there was "constant conversation" that management did not want to increase the size of staff to deal with these integration issues because of financial pressure from the multibillion dollar debt that Zebra took on in its acquisition of Motorola Enterprise.

153. The fact that the Motorola Enterprise acquisition was the largest in Zebra's history also served as a red flag for Defendants to closely follow the status of Motorola Enterprise's integration. Zebra paid a substantial $3.45 billion, 10.9x its EBITDA as of the time of the deal, to acquire Motorola Enterprise. The Company also took on an enormous $3.25 billion of debt in

connection with the acquisition and continued to incur substantial integration costs throughout the Class Period. Indeed, analysts at J.P. Morgan, in a note issued on November 11, 2015, stated that "***incremental acquisition related costs of $180-$200mm (10-15% in capex) was an unwelcome surprise, as IT integration with MSI is proving more costly than expected.***"

154. Following the Class Period, on November 15, 2016, Zebra issued a press release filed with the SEC on Form 8-K, announcing that Defendant Smiley was being replaced as the Company's CFO, a position he had held for eight years. The release stated that Zebra "today announced the appointment of Olivier Leonetti as Chief Financial Officer, effective November 16, 2016. He succeeds Michael C. Smiley, who is stepping down as Chief Financial Officer to pursue other opportunities. Mr. Smiley will work with Mr. Leonetti to facilitate an orderly transition."

155. The sudden replacement of Defendant Smiley as the Company's CFO after eight years in that position also supports a finding of scienter given that he only stepped down after the Company disclosed numerous accounting improprieties (related in part to the acquisition of Motorola Enterprise), material weaknesses in its system of internal controls over financial reporting, and a restatement of its financial statements for 2015 and the first two quarters of 2016.

156. Moreover, Defendants Gustafsson and Smiley's extensive financial experience provide additional support for their scienter. Gustafsson has been the Chief Executive Officer of Zebra as well as a director of the Company since 2007. Before joining Zebra, Gustafsson was CEO of Spirent Communications plc, a publicly traded telecommunications company, and had earned an MBA from the Harvard Graduate School of Business.

157. Defendant Smiley served as Zebra's CFO from 2005 until he was replaced on November 15, 2016. From 2004 until he joined Zebra, he served as general manager of Tellabs Inc.'s Denmark A/S unit. From 2002 to 2004, Defendant Smiley held various finance and operations

executive positions at Tellabs including interim chief financial officer, vice president, international finance, and treasurer. Before that, Defendant Smiley held a number of finance positions including Vice President, Asia Pacific Finance located in Taipei, Taiwan, for General Semiconductor and Assistant Treasurer for General Instrument. Mr. Smiley received a Bachelor of Science in accounting from Brigham Young University and an MBA degree from the University of Chicago.

**LOSS CAUSATION/ECONOMIC LOSS**

158. During the Class Period, as detailed herein, Defendants made false and misleading statements and omitted to disclose material information, and engaged in a scheme to deceive the market, and a course of conduct that artificially inflated the price of Zebra common stock and operated as a fraud or deceit on purchasers of Zebra common stock during the Class Period by misrepresenting the Company's business and prospects. As Defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of Zebra common stock fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of Zebra common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

159. Specifically, on August 11, 2015, the Company reported, *inter alia*, that gross margins for the second quarter of 2015 came in 160 basis points lower than its gross margins for the first quarter of 2015 and well below the level Defendants had led the market to expect for the quarter. On the Company's quarterly earnings call, held the same day, Defendants disclosed that the shortfall resulted from the "impact of purchase accounting and one-time accounting adjustments related to Enterprise that adversely affected results" and "expenses associated with the rebranding of products containing the Motorola marks." In response to these disappointing results, the price of Zebra common stock declined from $110.04 per share on August 10, 2015 to close at $83.80 per

share on August 11, 2015 – a decline of approximately $26.24 per share, or approximately 24%, on high trading volume of more than 4.5 million shares trading.

160. Then, on November 10, 2015, Zebra announced that $180 to $200 million in integration costs were necessary to address problems in connection with the Motorola Enterprise IT systems integration. In response to these disappointing results, the price of Zebra common stock declined from $82.99 per share on November 9, 2015 to close at $75.78 per share on November 10, 2015 – a decline of approximately $7.21 per share, or approximately 8.7%, on high trading volume of more than 1.5 million shares trading, more than three times greater than the average daily trading volume during the Class Period.

161. The declines in the prices of Zebra's stock after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price declines in Zebra's common stock negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and the other class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Zebra's common stock and the subsequent significant decline in the value of Zebra's common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET

162. Plaintiff is entitled to a presumption of reliance under the fraud-on-the-market doctrine because the market for Zebra's publicly traded stock was open, well-developed and efficient at all times during the Class Period. As a result of the materially false and misleading statements

alleged herein, Zebra common stock traded at artificially inflated prices during the Class Period. Further, Plaintiff and other members of the Class purchased Zebra common stock in reliance on the integrity of the market price of the common stock and the market information relating to Zebra, and were damaged thereby.

163. At all relevant times, the market for Zebra common stock was an efficient market for the following reasons, among others:

(a) Zebra common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient, electronic stock market;

(b) as a regulated issuer, Zebra filed periodic public reports with the SEC and the NASDAQ;

(c) Zebra regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Zebra was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

164. As a result of the foregoing, the market for Zebra common stock promptly digested current information regarding Zebra from all publicly available sources and reflected such information in the price of the common stock. Under these circumstances, all purchasers of Zebra common stock during the Class Period suffered similar injury through their purchase of Zebra common stock at artificially inflated prices and a presumption of reliance applies.

165. Plaintiff is also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are predicated in part upon omissions of material fact for which there was a duty to disclose. Specifically, Plaintiff is entitled to a presumption of reliance throughout the Class Period because, as more fully alleged above, Defendants failed to disclose material information regarding the integration of the Motorola Enterprise business, as well as the Company's operations, forecasts, and business prospects.

**COUNT I**

**For Violation of §10(b) of the Exchange Act and Rule 10b-5**
**Against All Defendants**

166. Plaintiff incorporates ¶¶1-165 by reference.

167. During the Class Period, Defendants carried out a plan that was intended to, and did: (a) deceive the investing public, including Plaintiff and the Class; and (b) artificially inflate the price of Zebra common stock.

168. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) employed devices, schemes and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Zebra common stock during the Class Period.

169. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Zebra common stock. Plaintiff and the Class would not have purchased Zebra common stock at the prices they paid, or at all, if they had been

aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and omissions.

## COUNT II

### For Violation of §20(a) of the Exchange Act Against the Individual Defendants

170. Plaintiff incorporates ¶¶1-169 by reference.

171. During the Class Period, the Individual Defendants participated in the operation and management of Zebra, and conducted and participated, directly and indirectly, in the conduct of Zebra's business affairs. Because of their senior positions, they knew the adverse non-public information about Zebra's false financial statements and materially weak internal controls.

172. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Zebra's financial condition and results of operations, and to correct promptly any public statements issued by Zebra that had become materially false or misleading.

173. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings that Zebra disseminated in the marketplace during the Class Period concerning Zebra's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Zebra to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Zebra within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged, which artificially inflated the market price of Zebra common stock.

174. Each of the Individual Defendants, therefore, acted as a controlling person of Zebra. By reason of their senior management positions and/or being directors of Zebra, each of the

Individual Defendants had the power to direct the actions of, and exercised the same to cause, Zebra to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Zebra and possessed the power to control the specific activities that comprise the primary violations about which Plaintiff and the other members of the Class complain.

175. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Zebra.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A. Determining that this action is a proper class action, certifying Plaintiff as Class Representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel;

B. Awarding compensatory damages in favor of Plaintiff and the other members of the Classes against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and attorneys' fees; and

D. Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: June 18, 2018

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
ROBERT D. GERSON

*/s/ David A. Rosenfeld*
DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
rgerson@rgrdlaw.com

*Lead Counsel for Plaintiff and the Class*

VANOVERBEKE, MICHAUD &
TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

*Additional Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 18, 2018, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such public filing to all counsel registered to receive such notice.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 18, 2018.

*/s/ David A. Rosenfeld*
DAVID A. ROSENFELD